May it please the Court, Cal Potter and Brent Bryson present today for Mark and Juliana England, the appellants in this action. Knowing that this Court is familiar with the facts of this case, I would like to deal with the issue of why the Court erred in granting summary judgment on the issue of qualified immunity. Can I ask a predecessor procedural question? I gather, and this is another issue in the case, but for now, there's – there was no deposition of Mr. England, right? Correct. So what are the facts, his version of the facts? How are they in the case exactly? I saw there was a statement that he wrote up and there was some interview. And are those – have those been submitted under penalty of perjury, and are they the facts that we're dealing with? They are the facts of the case. They were submitted under the Answers to Interrogatories, and the Court did look at those issues. And the interview was by the Internal Affairs Department from the Las Vegas Metropolitan Police Department. So there's no dispute that we can use that information? Yes. And the district court did review that and did make that a part of the finding, looking at the fact that he had sworn under in terms of the interrogatory answers. Okay. The concern – and I would also like to state, in addition to the facts, Mr. England did plead no contest to his disorderly conduct last summer in July, dealing with the first sequence of the case where he's going through the metal detectors at the airport. I would submit to the Court that what is important here is the review of the surveillance tape. And the report and order generated by the district court did not reference the review of the surveillance tape. Was it lodged as an exhibit with the summary judgment motion? Yes, it was, Your Honor. So it was before the district court. You just don't know whether or not the district judge looked at it because he never commented on the disorder? That's correct, Your Honor. And what is important here in terms of looking at it and getting a fair analysis is that the facts are to be reviewed, as the Court is well aware of, in the light most favorable to Mr. England. And in this particular instance, we submit to the Court that the surveillance tape is truly the neutral material and evidence that should be reviewed in terms of making that determination. You show everything because of the camera angle. I mean, there's a part of it where you can't see either Officer Jennings or Mr. England while the fight is ongoing. So it's not completely dispositive as to what occurred, is it? It isn't. But the argument, Your Honor, is that, in fact, if a jury were given the right to the statements made by Mr. England as to what was taking place at the time that the force was employed, they wouldn't be able to make that judgment. And I don't think he really disputes that, even in his statement. So he was, to that extent, resisting the officer at the time that the force was employed. He wasn't actively resisting, Your Honor. What he was doing was this. Well, that's a disputed fact. That's correct. And that's why it's important to the Court. It's correct that he stepped back and did not comply with the direct order. So if that's the case, isn't it true under Nevada law that you are not privileged to resist an arrest, and that if the officer had probable cause to make an arrest, then that carries with it the law, the authority to employ reasonable force to effectuate? That's a correct statement of the law. The issue then becomes what is reasonable, the argument being that, in this particular instance, what occurred was the baton. There wasn't a situation where he was allowed to respond to the orders. He is then struck with the baton on three different occasions. And what is important Oh, I'm sorry. Finish your thought. What is important is where the strikes are. The testimony is the strike is to the body area in contravention of the training across this country dealing with the extremities of arms or legs. And what is important here is he suffers fractured ribs and a blow to the head from the baton. My question is this. There are two separate excessive force claims here, one having to do with the baton strikes and one having to do with the taser. With respect to the case of Matos and Brooks, there is a difficulty understanding how this case is distinguishable from the Matos and Brooks cases in which we held that there was not clearly established law, even assuming a constitutional violation. How do you distinguish that piece of Matos and Brooks? Your Honor, I think in terms of what the court has held, clearly the only factual distinction as to Mr. England is as to the second and third blows from the taser while he's down on the ground. He, in fact, stated in his statement that he believed that Officer Clark coming up on the situation did not know what was really going on. And I think factually as well as legally, the first one is a situation Well, that's not quite accurate. I believe it was Officer Clark's testimony that he observed that the use of the baton was having no effect on Mr. England, and that's why he decided to deploy his taser. That's correct. Does that stay the record? That's correct, Your Honor. Is that what he said or did he say that Mr. England was trying to take the baton? Well, he stated at one point that he was hearing the beat, the blows by the baton. There is also testimony by one of the officers that Mr. England tried to grab the baton. The testimony of Mr. England was that he was trying to defensively ward off the blows from the baton. The question Your Honor had asked, though, dealing with the dart mode, is that he was down on the ground during the second time that he was tased, the third time he was down on the ground. And so in light of that, our arguments deal with the second and third jolts from the taser. Does it matter? What you can see on the tape, obviously, because there's no sound, is what Mr. England was saying. And there's obviously, there seems to be a direct conflict in terms of Mr. England saying, I was quiet and I didn't curse except that one time and so on, and then saying that he was abusive and so on and so on. Does any of that matter? In terms of what is reasonable, I don't believe it does, because what is important here is the excessiveness of the force that's used in terms of what Your Honor was talking about in terms of trying to handcuff him.  And I gather that the officer seemed to take what he was saying as at least indirectly threatening, as inherently threatening. Right. But he wasn't. There's no testimony that he struck the officer. There's no testimony that he attempted to flee. And I think what is important here, as my time is running down, there's another component of the case in terms of the State tort claims. And even assuming there isn't a constitutional violation, there are still State tort claims that would be available in terms of what was the standard of care, in terms of the treatment, what their training was, what the policies and practices and procedures were in that particular instance. One other question. Judge Graber suggested that there are two separate excessive force claims here. Is that right, or is there any authority for the proposition that you look at the whole? I mean, in other words, that you don't look sort of piece by piece, but instead, you know, what was the fact that you had the baton followed by the taser may put a different coloration on the taser. Is there any support for that? Is that your argument or what? That is our argument, Your Honor. In terms of looking at the facts that are going on, I think it's difficult to look at the factual part of the taser, since in this particular instance, there would be a joint situation where both officers were there at the same time at the initiation. Clearly, the taser is the second part of this case. It's factually broken up, although during the same sequence of time, as the Court is aware. But I would like to then talk about what has occurred here in terms of the Veda Supreme Court and their dealing with the issues of tort liability and looking to the federal tort claims as a basis for establishing that type of liability at this particular time, that it's discretionary, but it has to be pursuant to a policy practice as a procedure. Clearly, the judgmental acts of an officer do not fall within those parameters of those major policy issues. And I would ask that we have the state tort claims remanded for purposes of the case, as well as the actions dealing with the baton. Thank you, counsel. May it please the Court. Craig Anderson on behalf of the Las Vegas Metropolitan Police Department and the two defendant officers. To address the first issue you brought up with Mr. Potter, it does put us at a disadvantage to not have deposition testimony. We've certainly tried. He refused to give one. So we're stuck with a statement that says — But I gather you could have not moved for summary judgment at that point. Well, there was 400 days that he was going to be deployed. Sorry, what? There were court order deadlines that we had to comply with as far as the summary judgment order, because the court — the discovery order, because the court did refuse to stay the litigation, which is what we suggested at the start. But anyway, so we're stuck with statements that say, I didn't resist, but we don't know what that means, because we didn't get a chance to cross-examine him or to find out. Say what? I'm sorry. I didn't hear you. We're stuck with statements that are just blanket statements. For example, I didn't resist. I was compliant. But we never had the opportunity to say, what does that mean to you? You know, what do you mean you weren't resisting? But he was very specific about things — some things, and about which there does seem to be a direct conflict in the facts. I'm having a hard time understanding how we can do this in summary judgment. Yes. And, you know, and based upon his own statements, we still obtained summary judgment on it, and I would point out that we received summary judgment on it. So in other words, you could have summary judgment even though on his representation he was perfectly calm the whole time, he did not yell at anybody, he did not curse at anybody, he gave — I mean, that's what I understood him to say. I don't know whether that would make a difference, but certainly in terms of what was being said about why people were afraid of him and why people thought that he was likely to cause a problem, no one's claiming he actually did cause a problem. They're just claiming that they had — they were apprehensive of him. Yeah. In his statement, he admits he uses profanity. Twice, yes. Once. But — and what we have is we have some objective factors here that his behavior was significant enough that the initial TSA agent called their supervisor, who then called the police officers over, which showed there was something going on. But then also, despite his statements, the officer handles, you know, the first situation exactly as you instructed to. He uses officer presence, he uses verbal commands, he diffuses. But no one's complaining about that. Yeah. But in the second version. In the second version, England admits that when the officer took him by the shoulder to turn around to handcuff him, that he then diffused. But the question is, why was the officer doing any of this? I mean, the — on his story, the officer — the officer said he was — things like, well, I could — I thought he had PTSD and I thought his eyes looked like  He was the subject of a series of readings of the — of what he was seeing, most of which do not involve any actual force or even an attempt at force. Yes, but when you said look at this in the totality of the circumstances, that's what you have to do. And when he comes back to a secured area, that's a serious issue. He's now coming into a secured area of an airport. He's coming back after a situation has been diffused, and there's only one reason he would come back. And that is to cause problems. He's coming back to readdress the situation. Oh, yes, but that doesn't mean he's there to cause problems. I mean, I've had reason to go talk to TSA supervisors about things. Yeah. They're not there to cause problems. They're there to find things out, like why they don't like my — my Federal ID and can I use it? And so — but when he came back, the officer, again, didn't resort to force. What he does, he separates the two combatants or the two people who are arguing, and he then attempts to walk him away to diffuse the situation. And he only determines that an arrest is necessary when he will not hand him his boarding pass. And that is admitted. He hands him two separate pieces of paper and — But there's a dispute about that, too, because my understanding there is that he says that he was fumbling for his boarding pass and that the officer seized this dollar bill out of his hand and threw it on the floor when he was just about to put it in his pocket and go back and find the boarding pass.  That's the case.     He can't take him into custody. But he can't take him into custody. And that's the case. But regardless, he had the right to take him into custody. He had the right to arrest him for using profanity the one time at the TSA agent, and then he's causing a disturbance. That's true. What's the basis for that? The basis for that is that it's a violation of airport rules. And so he has come back. He's now causing a disturbance. He's stopping the regular flow of traffic as everyone is looking at this altercation. And so the officer determines to take him into custody. And if that — Counsel, as we're talking about what Mr. Englund did that was disruptive, what were the facts that he pleaded guilty to disorderly conduct for? In other words, what was the factual basis for that plea? When he — I don't know because I was not involved in the criminal. And I just learned today that he pled no contest. It's my understanding the charges were ongoing. So I don't know which of the — he was charged with violation of airport rules and obstructing a police officer. So if he pled no contest to the obstructing of a police officer, the obstruction would be when the officer attempted to take him into custody and he dipped his shoulder and pushed away. And that would be something for which he could be arrested lawfully? Presumably if he pleaded guilty, then, or no contest, then he could be arrested for whatever it was. Yes. I mean, again, you know, the officer was that he was causing a disturbance, that he was not doing what the officer asked, that he was resisting him. And then when the officer, under the Arpin case, once he decided to take him into custody, he did not have a right to resist. But if you're — so your position is that if he's arresting someone for — who hasn't presented any danger, because that's the theory at this point, i.e., that's what Mr. Englund is saying, and hasn't been out of control and hasn't been cursing people out except for this one statement, which was in his state — in his account which is sort of a gratuitous use, a fleeting expletive, let's say. What — so your position is that he can use — let's leave the tasers aside, that he can use this baton and this man — The baton, initially, no. Once he dips his shoulder and pushes away from him, he's now attempting an empty hand technique to take him into custody to handcuff him, which he has a right to do. Englund's a large man. He has returned to a situation that escalated in Officer Jennings' perception. Now this man has pushed away from him and is facing him. He has also told him — The man has pushed away from him, but not pushed him, according to Mr. Englund. According to Englund, no. Dipped down his shoulder and spun away. So what does Officer Jennings do? And this is admitted by Englund. He pulls out his baton and says, get on the ground. So he's not going right to the baton. This is the issue that we have in Mateos, Bryan, and most recently the Young v. County of Los Angeles case with the use of the baton, is that there's not warning, that the suspect does not have the — And Mr. Englund's story, again, was that he swung so fast he didn't have time to get on the ground. Well, he says I was — as I was attempting to comply, but what does that mean? That's the story, okay? So this is a summary judgment. So we get the first strike, and then we go to the second strike. So it's okay to strike him in the time it took him to get on the ground? Well, this is where the video actually does come in. You can see from the video that the baton is held back. And, you know, you can't hear it. We've established that. But you can look at that video under the — I looked. I couldn't tell much of anything. It's hard, but you can tell that the baton — there's a dialogue. Even with the taser, you can tell. So the baton's back. So there is a command. You never see Englund make any attempt to go down or do that. And so he said — so then you have that strike. And so the officer, then he makes no attempt after that. So the baton strike only came after an officer presence, verbal, and the attempt of an empty hand handcuffing technique failed. And once the handcuffing technique failed, what's the officer to do? This is a large man with military training who is not going to be handcuffed. He resisted three attempts at handcuffing. So at that point, he had to make a decision as to the next level of force to take him into custody. And he chose the baton. And the reason they're doing this is because he used one curse word at one person. According to Englund, the reason — I understand that. And I still think the totality of this case, the fact that he comes back to this secure area is — heightens the awareness of the officer that this person is not going to take no for an answer. I mean, he has come back to re-address, to reevaluate the situation where Mr. Englund was wrong. And he's come back to reconfront the TSA agent. So there is the totality here. I'm sorry. I'm having a hard time seeing why that leads to being able to arrest him today. Well, that wasn't why he arrested him. But that goes to the state of mind of the officer, that this man is not going to let this go. Right. Okay. That's fine. I mean, he might have a right to talk to people who they want to talk to. Yeah. And so — and then once he separates them and then takes him there, Englund is still noncompliant. Englund admits that he's noncompliant in everything he's asked to do. He never gives him the boarding pass. He's intuitive. He said he was trying to give him the boarding pass. But he failed on two attempts. And this goes to what the — what a reasonable officer could perceive. You're looking also at what a reasonable officer could perceive. Let me just ask a question. There — by my count, there are six witnesses, four TSA and two police witnesses, who all testified that Mr. Englund, contrary to his statement, was not calm, cool, and collected, but was using profanity, had been drinking, essentially was verbally aggressive with everybody that he came in contact with. In the face of that evidence, is there any authority that we can simply disregard as inherently unbelievable Englund's claim that he was not the primary aggressor here? I don't think that you can disregard it, but you can use that information that it was reasonable for the officer to have the perceptions that he did. How is that possible on summary judgment?  Well, because in summary judgment — We don't get to say, well, there are four witnesses or ten witnesses on one side and one on another. You're correct. So you do have to take — Englund's story is true, but you also have to look at what a reasonable officer would know and do. And these statements support what a reasonable officer would know. If four people say someone was acting aggressive and he says he wasn't, that goes to the reasonableness of the officer's actions, that the officer — that he's not crazy, that the three other people also perceived this as a threat. They also perceived him as aggressive. And so even assuming Englund's statement is true, his behavior was significant enough that other people also viewed him as a threat, which goes into the reasonable officer standard, the objective standard there. Thank you, counsel. You have used up more than your time. I apologize. I appreciate your argument. No, that's okay. And, Mr. Prater, since we used a lot of your time with questions, you may have a minute if you want it. Thank you. I was trying to fill the court in pursuant to our arguments dealing with the state tort claims. What had occurred in the Nevada Supreme Court is that there was a position pursuant to statute that the waiver of tort liability was to be favored in terms of looking at what was discretionary versus being done pursuant to a policy or practice. It basically adopted the Federal standard, is that right? I'm sorry? Adopted the Federal standard. Yes, ma'am. Yes, we did in Nevada. And they utilized some of the case law of the Federal tort cases dealing with excessive force. The case, the Butler v. Bear case, was a prison case where they said, you know, there were issues. Is there no immunity defense? No, there is an immunity defense, but it has to be. What's the difference between the State and the Federal claim? The State has now adopted the Federal tort claim. I understand that. But is there immunity defense? There is an immunity issue if, in fact, it was done pursuant to an economic policy or a social policy. Clearly, the actions. That's not an immunity defense. That's what a discretionary act is. But is there also an immunity defense? No. In terms of what occurred here, there was a situation where they made some judgments, but the actions of the officers were not done pursuant to that. So there's no immunity overlay under State law? Correct. Other than if you look at it on a fact-by-fact basis or case-by-case basis as to what the basis was. Clearly, they had waived immunity under the State Tort Claim Act. Particularly as to intentional torts, there is no immunity as to intentional torts, and that was part of the argument that was being made. Thank you, counsel. We appreciate the arguments of both parties. And the case is submitted.
judges: Graber, Berzon, Tallman